The **ALABAMA FREETHOUGHT ASSO-CIATION, Gloria Hersheiser, Barbara Stappenbeck, and Herb Stappenbeck,** Plaintiffs,

v.

The **Honorable Roy S. MOORE,** Defendant.

**No. CV 95–PT–0792–M.**

United States District Court, N.D. Alabama, Middle Division.

July 7, 1995.

Pamela L. Sumners and Elizabeth J. Hubertz, Birmingham, AL, Joel Sogol, Tuscaloosa, AL, for plaintiff.

Albert L. Jordan, Algert S. Agricola, Jr., Wallace Jordan Ratliff Byers & Brandt, LLC, Birmingham, AL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PROPST, District Judge.

The complaint in this action charges that defendant, a judge in the Circuit Court of Etowah County, Alabama, has caused a plaque depicting the Ten Commandments to be hung behind the bench in his courtroom in the Etowah County Courthouse. The complaint also alleges that, in presiding over jury organizing sessions, defendant has caused prayer to be uttered. On these facts, plaintiffs allege that defendant is violating the Establishment Clause of the First Amendment. Plaintiffs seek a declaratory judgment that defendant is in violation of the First Amendment, and an injunction barring defendant from displaying the plaque behind his bench and from causing prayer to be uttered at jury organizing sessions.[1]

On April 21, 1995, defendant filed a Motion to Dismiss, or in the Alternative, for Stay. On April 28, 1995, defendant filed an Amended Motion to Dismiss, or in the Alternative, for Stay. The court is considering these Motions.

The issues presented by the Motions are twofold:

1. whether plaintiffs have standing, as either citizens or taxpayers,[2] to maintain this action; and

2. whether, assuming that plaintiffs have standing, the court should abstain from exercising jurisdiction.

## FINDINGS OF FACT

### I. The allegations in support of standing.

The allegations in the complaint pertinent to standing are as follows:

4. Plaintiff Alabama Freethought Association is a non-profit association which has

---

1. Plaintiffs seek declaratory and injunctive relief *exclusively.* There are no claims for damages. Plaintiffs have not pursued a general request for a preliminary injunction.

2. Plaintiffs have not attempted to bring this action on behalf of non-parties; in other words,

plaintiffs have not asserted third-party standing. *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Accordingly, it is unnecessary for the court to consider that doctrine. The standing of the plaintiff Association will be discussed. *See infra* note 21.

as one of its primary concerns the separation of church and state as guaranteed by the United States Constitution and the Constitution of the State of Alabama. A number of its members reside in Etowah County, Alabama, and *are subject to* attending Judge Moore's courtroom in Gadsden, either as jurors, litigants, witnesses or observers, and being forced to listen to the opening prayer in Defendant's courtroom and observe his religious symbol(s). These members are, *or would be,* offended by Defendant's unconstitutional prayer and display and must, therefore, assume special burdens to avoid Defendant's unconstitutional conduct.

5. Plaintiffs Gloria Hersheiser, Barbara Stappenbeck and Herb Stappenbeck are resident citizens and taxpayers of Etowah County, Alabama, and *are subject to* attending Judge Moore's courtroom in Gadsden, either as jurors, litigants, witnesses or observers, and being forced to listen to his opening prayer and observe his religious symbol(s). Plaintiffs are and will continue to be offended by Defendant's unconstitutional prayer and display and must, therefore, assume special burdens to avoid Defendant's unconstitutional conduct.

6. All Plaintiffs object to Defendant's practice of opening court with prayer and his display of religious symbol(s), and believe that this practice violates the First and Fourteenth Amendments to the United States Constitution. Plaintiffs Hersheiser, Stappenbeck and Stappenbeck are taxpayers in Etowah County, Alabama, and the State of Alabama. Plaintiff Alabama Freethought Association has, as members, persons who are taxpayers in Etowah County, Alabama, and the State of Alabama. All Plaintiffs are of the opinion that the Defendant's conduct is an attempt by a Judge to symbolize government approval and endorsement of religion. Each Plaintiff is offended by Defendant's conduct. All Plaintiffs believe their rights

have been infringed by the Defendant's conduct.

. . . .

14. There is between the parties an actual controversy as hereinbefore set forth. The Plaintiffs are suffering irreparable injury and harm and are threatened with irreparable injury and harm in the future be reason of the acts herein complained of. A substantial loss or impairment of the Plaintiffs' rights under the First Amendment to the Constitution of the United States has occurred and will continue to occur so long as the Defendant's conduct is allowed to continue. The Defendant's display of the Ten Commandments and the use of Christian prayer to open his court exerts a chilling effect on Plaintiff's First Amendment religious protection in that these acts send a message to Plaintiffs, attorneys, litigants and all others who enter the Courthouse that the Defendant and the judicial system encourage and endorse the practices of religion in general and the practice of Christianity in particular, favor Christians in the application of law and the administration of justice.

Complaint at 2–4 (emphasis added).

## II. The evidence offered by plaintiffs in support of standing.

In response to the motions, plaintiffs have filed affidavits which set forth facts allegedly supporting each plaintiff's standing. Plaintiff Gloria Hersheiser's relevant testimony by affidavit is as follows:

3. I have been present in Judge Roy S. Moore's courtroom in the Etowah County Courthouse in Gadsden, Alabama on more than one occasion. While there, on at least one occasion, I observed what appeared to be a hand carved plaque of the Ten Commandments on the wall behind his bench in the courtroom and I heard Judge Moore invite a guest to open the court session with prayer. The prayer I heard was a distinctly Christian prayer.[3]

---

**3.** Hersheiser's affidavit seems to suggest that she observed the prayer and the plaque on the same occasion. At the June 14, 1995 evidentiary hearing, she testified that she observed the Ten Commandments approximately 18 months ago, when she was summoned to appear in defendant's court as a witness, and that she, for the first and only time, observed the prayer in April, 1995, after this action was filed, at which time she voluntarily went to a jury organizing session over

4. Within approximately the last two years, I have been subpoenaed to testify before Judge Moore in a pending divorce case. I do not recall the case style nor the case number. Though I appeared for court as required, I was not called to testify.

5. I am a registered voter in Etowah County, Alabama. I have been called and have served on the grand jury and as a jury member for a trial in Etowah County, Alabama. I remain subject to being called for jury duty in Etowah County, Alabama.

6. I am currently a party to the following action pending in small claims court in Etowah County, Alabama: *James W. Jones v. Gloria Hersheiser*, Case No. SM–95–001043.00, before District Court Judge Wayne Owen. I understand that if my small claims case is appealed, it would be appealed to the Circuit Court of Etowah County, Alabama.[4]

7. I am offended by Judge Moore's initiation of prayer and by his display of the Ten Commandments in his courtroom.

Affidavit of Gloria Hersheiser, Plaintiffs' Exh. A,[5] at 1. Plaintiffs Barbara and Herb Stappenbeck repeat most of paragraphs 5 and 7 of Hersheiser's affidavit.[6] *See* Affidavit of Barbara Stappenbeck, Plaintiffs' Exh. B, at 1; Affidavit of Herb Stappenbeck, Plaintiffs' Exh. C, at 1. To establish its standing, plaintiff Alabama Freethought Association relies on the standing of plaintiff Hersheiser and of unnamed members who are allegedly subject to being called to defendant's court as jurors, witnesses, or parties.

Affidavit of Pat Cleveland, plaintiffs' Exh. D, at 1. There has been no evidence presented to suggest that any such member other than Hersheiser has ever been so called.

### III. The testimony and evidence received at the evidentiary hearing of June 14, 1995.

The court received evidence and testimony on the issue of standing at a hearing convened on June 14, 1995.[7] From the testimony[8] at the hearing and the affidavits, the court finds the following facts as to each plaintiff:

### A. Gloria Hersheiser

1. Gloria Hersheiser is a resident of, a registered voter in, and a taxpayer of Etowah County, Alabama.

2. Hersheiser owns a vehicle which is registered in her name in Etowah County, Alabama.

3. Hersheiser has been a dues-paying member of the Alabama Freethought Association since July, 1994.

4. Hersheiser has been summoned for jury service in the Circuit Court of Etowah County on two occasions. She was first summoned for service in the late 1960s, at which time she served on a grand jury. Several years later, she was again summoned for service, at which time she served on a petit jury. In her estimation, this more recent

---

which defendant was presiding, merely to observe it.

4. According to Hersheiser's testimony at the June 14, 1995 hearing, the plaintiff in this state district court action has dismissed the case. *See infra.* The court notes that the case was both filed and dismissed in 1995.

5. Attached to Plaintiffs' Memorandum in Opposition to this motion.

6. Plaintiff Barbara Stappenbeck has not stated that she has served on any kind of jury. Plaintiff Herb Stappenbeck has stated that, although he has been called to jury service, he has never been selected to serve on a jury panel. He has not offered evidence that he has been called to jury service after the defendant became a judge.

7. The court set the matter for hearing because of apparent evasions in the affidavits as to dates, etc. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) (noting that, when presented with a complaint which does not clearly set forth the bases for a plaintiff's standing, the court may order that the plaintiff amend the complaint, or may require the plaintiff to present evidence which establishes standing).

8. The testimony of the individual plaintiffs was relatively undisputed and likely could not have been disputed. The court has accepted plaintiffs' testimony without, at this stage, making credibility determinations.

service occurred at least 15 years ago,[9] well before defendant became a circuit judge.

5. By virtue of her status as a registered voter, as a person in whose name a motor vehicle is registered, and as a person who is the record owner of real property subject to ad valorem taxation, Hersheiser remains subject to being summoned for jury service in the Circuit Court of Etowah County.[10]

6. Approximately 18 months ago, Hersheiser was subpoenaed to testify in a domestic relations case scheduled for trial in defendant's court. Upon entering defendant's courtroom on that occasion, she observed a plaque in the shape of tablets hanging behind defendant's bench, on which were inscribed the Ten Commandments.[11] Hersheiser could read the inscriptions with the aid of her glasses, which she testified that she was wearing on that occasion. She remained in the courtroom for only a few minutes. Thereafter, she sat on a bench outside the courtroom, around which other participants in the trial were gathering. Hersheiser was never called into defendant's courtroom as a witness. She was not required to be in the courtroom while other witnesses testified. She was offended, during her brief stay, by

the display of the Ten Commandments because it is a religious symbol.

7. Sometime around April 15, 1995, after this action had been commenced,[12] Hersheiser voluntarily attended a jury organizing session in a courtroom in the Etowah County Courthouse.[13] Several members of the press, including television camera operators, were present on that occasion.[14] At the commencement of this session, defendant, who was presiding, informed those assembled that the session would begin with a prayer and, thereafter, the reciting of the Pledge of Allegiance. Defendant informed those assembled that anyone not wishing to participate would not be required to do so.

8. In March or April of 1995, Hersheiser was sued in the District Court of Etowah County. Hersheiser was never required to appear in court by virtue of that lawsuit. That suit was dismissed several weeks before the June 14 hearing. It is pure speculation that Hersheiser would have been in defendant's courtroom *if* the case had been tried and *if* it had been appealed to the Circuit Court of Etowah County. There are three other circuit judges in Etowah County, any one of which could have been assigned Her-

---

9. Hersheiser's testimony is unclear as to exactly when her two terms of jury service occurred. *Compare* Transcript of Hearing at 52 (first service was "in the late sixties ... and the next time I was called ... was maybe several years later ...") *with id.* at 53 (first service was 20 years ago, and the second was 15 years ago).

10. The evidence is not entirely clear as to which persons are considered eligible for jury service in Etowah County. At the hearing the plaintiffs suggested that such eligibility is based on one or more of the criteria stated above. With the parties' consent, the court solicited information from the Circuit Clerk of Etowah County, Alabama regarding the method by which the list of potential jurors is constructed. The Clerk's responses, which the court has placed in the evidence of record, suggests that eligibility for jury service is limited to those residents of Etowah County who (1) are over the age of 19, and (2) who have drivers' licenses or official photographic identification. There may have been no evidence that any individual plaintiff has a driver's license. For the purposes of resolving the standing issue, the court will accept plaintiffs' representation and will assume that all individual plaintiffs are among a large number of Etowah County citizens who are eligible for jury service.

11. Again, Hersheiser's affidavit seemed to suggest that, on this same occasion, she observed defendant's causing prayer to be said in his courtroom. Her testimony, however, made clear that, on this occasion, she did not observe defendant's causing prayer to be uttered.

12. Plaintiffs commenced this action on March 31, 1995.

13. Hersheiser's attendance at this session was not compelled by a summons for jury service or otherwise. She apparently attended so that she could testify about what she observed. This was not made clear in her affidavit.

The jury organizing sessions are not conducted in the courtroom to which defendant is assigned (and in which allegedly hangs the plaque bearing the inscription of the Ten Commandments). No such plaque was displayed on that occasion in the courtroom in which the jury organizing session occurred.

14. There is a reasonable inference that Hersheiser knew in advance what would happen at the session.

sheiser's case, *if* it had been tried and appealed.

9. There is no evidence that Hersheiser's daily affairs require her to go to the Etowah County Courthouse, or that she goes there on a regular basis. There is no evidence that Hersheiser goes to defendant's courtroom on a regular basis or has any reason to do so.

10. There is no evidence that Hersheiser's chances of being summoned for jury duty in defendant's court are any greater than the chances of any other resident of Etowah County who is eligible for jury service.

11. There is no evidence that Hersheiser's chances of being subpoenaed to appear in defendant's court as a witness or appearing as a party in an action in his court are any greater than the chances of any other person subject to the jurisdiction of the Circuit Court of Etowah County, Alabama.

### B. *Barbara Stappenbeck*

1. Barbara Stappenbeck is a resident of, a taxpayer in, and a registered property owner in, Etowah County, Alabama.

2. Barbara Stappenbeck is not a member of the Alabama Freethought Association.

3. Barbara Stappenbeck was summoned for jury service about 7 years ago, several years before defendant became a judge in the Circuit Court of Etowah County.

4. Barbara Stappenbeck has never been in defendant's courtroom.

5. Barbara Stappenbeck has never been present in any court in which defendant was presiding.

6. Barbara Stappenbeck's daily affairs do not require her to go to the Etowah County Courthouse, nor does she regularly go there. There is, of course, no evidence that Barbara Stappenbeck goes to defendant's courtroom on a regular basis or has any reason to do so.

7. By virtue of her status as a taxpayer and registered voter, Barbara Stappenbeck is subject to being summoned for jury service in the Circuit Court of Etowah County, and is thereby subject to being selected for service on a petit jury in defendant's court.

8. *If* she were summoned for jury service, and *if* she were required to attend a jury organizing session, and *if* defendant presided over that session, and *if* defendant caused prayer to be uttered at that time, Barbara Stappenbeck would be offended and would leave.

9. There is no evidence that Barbara Stappenbeck's chances of being summoned for jury duty in defendant's court are any greater than the chances of any other resident of Etowah County who is eligible for jury service.

10. There is no evidence that Barbara Stappenbeck's chances of being subpoenaed to appear in defendant's court as a witness or appearing there otherwise are any greater than the chances of any other person subject to the jurisdiction of the Circuit Court of Etowah County, Alabama.

### C. *Herb Stappenbeck* [15]

1. Herb Stappenbeck is a resident of, a taxpayer in, and a person in whose name a motor vehicle is registered in, Etowah County, Alabama.

2. Herb Stappenbeck has been summoned for jury service. There is no evidence that this tenure of jury service occurred while defendant has been a Circuit Judge in Etowah County, Alabama. Nor is there evidence that, if such jury service occurred during defendant's tenure on the bench, Herb Stappenbeck came into contact with any conduct or symbol(s) which he found to be offensive.

3. By virtue of his status as a registered voter, and a person in whose name a motor vehicle is registered, Herb Stappenbeck remains subject to being summoned for jury service.

4. There is no evidence that Herb Stappenbeck's daily affairs require him to go to the Etowah County Courthouse. There is, of course, no evidence that Herb Stappenbeck

---

**15.** The findings of fact as to Herb Stappenbeck are based almost exclusively on his affidavit. He did not testify at the hearing. Barbara Stappenbeck testified that the motor vehicle which she drives is registered in Etowah County in Herb Stappenbeck's name.

goes to defendant's courtroom on a regular basis or has any reason to do so.

5. There is no evidence that Herb Stappenbeck's chances of being summoned for jury duty in defendant's court are any greater than the chances of any other resident of Etowah County who is eligible for jury service.

6. There is no evidence that Herb Stappenbeck's chances of being subpoenaed to appear in defendant's court as a witness or appearing otherwise are any greater than the chances of any other person subject to the jurisdiction of the Circuit Court of Etowah County, Alabama.

### D. *Alabama Freethought Association*

1. A few unnamed members of the Alabama Freethought Association reside in Etowah County, Alabama.

2. According to its by-laws, one purpose of the Alabama Freethought Association is to promote the separation of church and state.

3. One of the Association's members is plaintiff Hersheiser.

4. At an October, 1994 meeting of the Association, the decision was made to commence this action.

5. There is no evidence that the probability that any member of the Association will be summoned for jury duty in defendant's court is any greater than the probability that any other resident of Etowah County who is eligible for jury service will be so summoned.

6. There is no evidence that the probability that any member of the Association will be subpoenaed to appear in defendant's court as a witness or appearing there otherwise is any greater than the probability that any other person subject to the jurisdiction of the Circuit Court of Etowah County, Alabama will be so subpoenaed.

## CONCLUSIONS OF LAW

### I. The Law of Standing [16]

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). "As an incident to the elaboration of [the case-or-controversy] requirement, ... a litigant must have 'standing' to challenge the action sought to be adjudicated in the lawsuit." *Id.* Thus, "[t]he doctrine of standing is 'an essential and unchanging part of the case-or-controversy requirement of Article III'...." *Northeastern Florida Chapter of the Associated Gen. Contractors v. City of Jacksonville,* —— U.S. ——, ——, 113 S.Ct. 2297, 2301, 124 L.Ed.2d 586 (1993), *quoting Lujan v. Defenders of*

[16.] "Standing" involves the determination of whether a named plaintiff is the proper party to bring an action, not whether anyone might successfully maintain such an action. In other words, a court's determination that a party lacks standing does not reach the merits as may be applicable to another person with standing. See *O'Hair v. White,* 675 F.2d 680, 685 (Former 5th Cir.1982) (en banc) ("Perhaps the most fundamental aspect of the standing doctrine is that it focuses *on the particular plaintiff* seeking to bring his claim before the federal court, *not on the issues or merits of the case.*") (emphasis added).

Courts have been accused of manipulating standing questions. Manipulation can, of course, work both ways. The United States Supreme Court has emphatically rejected the proposition that standing is merely a tool of manipulation, the requirements of which can be summarily disposed with:

[T]he philosophy that the business of the federal courts is correcting constitutional errors, and that "cases and controversies" are at best merely convenient vehicles for doing so and at worst nuisances that may be dispensed with when they become obstacles to that transcendent endeavor[,] ... has no place in our constitutional scheme. It does not become more palatable when the underlying merits concern the Establishment Clause.

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 489, 102 S.Ct. 752, 767, 70 L.Ed.2d 700 (1982).

Likewise, this court rejects the proposition that the standing doctrine exists solely for the convenient avoidance of an issue, be it constitutional or otherwise. In order to maintain this action, the plaintiffs must establish that they have standing. The proper approach for this court is to determine what controlling authorities have held and to apply stated standards to the facts of this case. Moreover, while the standing doctrine has been criticized, the critics merely reinforce the fact that the doctrine of standing, in a rather stringent form, is alive and well.

*Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *accord Cone Corp. v. Florida Dept. of Transp.* 921 F.2d 1190, 1203 (11th Cir.), *cert. denied,* 500 U.S. 942, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991) ("Article III of the United States Constitution limits the jurisdiction of the federal courts to actual cases and controversies. The standing doctrine is an aspect of this case or controversy requirement.") (citation omitted). Because a litigant's standing is essential in order to create an Article III case or controversy, standing strikes at the heart of a federal court's jurisdiction to resolve the merits of a dispute. *See Lujan,* 504 U.S. at 559, 112 S.Ct. at 2136 (noting that "[Article III, § 1] limits the *jurisdiction* of federal courts to 'Cases' and 'Controversies[.]'") (emphasis added).

### A. *Citizen Standing*

■ The United States Supreme Court has set forth and defined the three elements which form the "irreducible constitutional minimum" [17] requirements of standing:

It has long been established by a long line of cases that a party seeking to invoke a federal court's jurisdiction must demonstrate three things: (1) "injury in fact," by which we mean an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan* ... 504 U.S. at [560], 112 S.Ct. at 2136 (citations, footnote, and internal quotation marks omitted); (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury "fairly can be traced to the challenged action of the defendant," and has not resulted "from the independent action of some third party not before the court," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42 [96 S.Ct. 1917, 1926, 48 L.Ed.2d 450] ... (1976); and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the "prospect of obtaining relief from the injury as a result of

a favorable ruling" is not "too speculative," *Allen v. Wright,* ... 468 U.S. [737,] 752 [104 S.Ct. 3315, 3325, 82 L.Ed.2d 556] (1984). These elements are the "irreducible minimum," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464 [102 S.Ct. 752, 70 L.Ed.2d 700] (1982), required by the Constitution.

*City of Jacksonville,* —— U.S. at —— - ——, 113 S.Ct. at 2301–02; *accord United States v. Hays,* —— U.S. ——, —— - ——, 115 S.Ct. 2431, 2434–36, 132 L.Ed.2d 635 (1995) (same).[18]

■ Where a plaintiff seeks declaratory and injunctive relief, i.e., "forward-looking relief," the injury-in-fact which plaintiff must allege and prove must be both "particularized" and "imminent." *Adarand Constructors, Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2104, 132 L.Ed.2d 158 (1995). For an injury to be "imminent," the injury must be "'certainly impending,'" *id.* at ——, 115 S.Ct. at 2105, *quoting Lujan,* 504 U.S. at 564 n. 2, 112 S.Ct. at 2138 n. 2, and must present a "real and immediate threat" of future harm. *Adarand,* —— U.S. at ——, 115 S.Ct. at 2104. The Eleventh Circuit has developed this requirement of "imminence" in the context of claims for injunctive and declaratory relief:

A plaintiff must meet three requirements to have article III standing. First, if ... the plaintiff seeks declaratory and injunctive relief, he must demonstrate that he is likely to suffer future injury; second, that he is likely to suffer future injury at the hands of the defendant; and third, that the relief plaintiff seeks will likely prevent such injury from occurring.

. . . .

The first prerequisite for standing to seek the equitable relief ... is the demonstration of a threatened injury. The plaintiff must present "specific, concrete facts" showing that the challenged conduct will result in a "demonstrable, particularized

---

17. *See Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136.

18. If a plaintiff satisfies the constitutional requirements of standing, the court must then de-

termine whether certain prudential considerations counsel in favor of conferring standing on that litigant. *See infra* note 31.

injury" to the plaintiff so that the plaintiff "personally w[ill] benefit in a tangible way" from court action. *Warth [v. Seldin]*, 422 U.S. [490,] 508, 95 S.Ct. [2197,] 2210 [45 L.Ed.2d 343 (1975) ]. The injury must be "real and immediate," not "conjectural" or "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).

. . . .

The second prerequisite for standing . . . is that the plaintiff must show that the defendant is likely to cause the anticipated injury—there must be a "fairly traceable" nexus between the threatened deprivation of the . . . right and the action of the defendant. *Simon [v. Eastern Ky. Welfare Rights Org.]*, 426 U.S. [26,] 38, 41–42, 96 S.Ct. [1917,] 1924–26 [48 L.Ed.2d 450 (1976) ] . . . .

In sum, a plaintiff seeking declaratory and injunctive relief demonstrates these first two standing requirements only if the plaintiff shows that the defendant is likely to injure the plaintiff. The Supreme Court has acknowledged this in a series of cases. *See Lyons*, 461 U.S. at 105–09, 103 S.Ct. at 1667–69 (plaintiff once subject to a police stranglehold had no standing to seek injunctive relief without a showing that "he was likely to suffer future injury" from police brutality); *Juidice v. Vail*, 430 U.S. 327, 331–33 & n. 9, 97 S.Ct. 1211, 1215–16 & n. 9, 51 L.Ed.2d 376 (1977) (plaintiffs who had been released from prison had no standing to seek injunctive relief when the complaint did not allege "the likelihood, or even the possibility, of future contempt orders"); *Rizzo v. Goode*, 423 U.S. 362, 372, 96 S.Ct. 598, 605, 46 L.Ed.2d 561 (1976) (plaintiffs seeking injunction barring an alleged policy of police brutality had no standing based on "what a small, unnamed minority of policemen might do to them in the future"); *O'Shea [v. Littleton]*, 414 U.S. [488,] 495–96, 94 S.Ct. [669,] 676 [38 L.Ed.2d 674 (1974) ] (plaintiffs challenging alleged discriminatory bail-setting had no standing to seek injunction without a showing that they were likely to be arrested and subject to the challenged practices); *Golden v. Zwickler*, 394 U.S. 103, 108–09, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969) (plaintiff who had been convicted of distributing anonymous handbills in past election campaign but whose future conviction was "most unlikely," alleged no controversy deserving declaratory relief for future campaigns). Like the Supreme Court, this circuit also has acknowledged the plaintiff's need to show the likelihood of injury as a prerequisite for standing to obtain equitable relief. *See Kerr [v. City of West Palm Beach]*, 875 F.2d [1546,] 1554 [ (11th Cir.1989) ] (plaintiff bitten by a police dog had no standing to seek declaratory and injunctive relief absent a showing that an unlawful seizure is likely to recur) . . . .

*Cone v. Florida Dept. of Transp.*, 921 F.2d 1190, 1203–05 (11th Cir.), *cert. denied*, 500 U.S. 942, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991) (citations and footnotes omitted); *accord Emory v. Peeler*, 756 F.2d 1547, 1551–52 (11th Cir.1985) (a plaintiff seeking a declaratory judgment must establish an "actual controversy" in order to have standing); *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir.1994) ("Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury").

▪ Thus, to establish citizen standing to obtain injunctive and declaratory relief, a plaintiff must establish a "real and immediate threat of future harm;" in other words, that injury, i.e., injury-in-fact, is "certainly impending." [19]

---

19. Plaintiffs bear the burden of establishing their standing. *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136. The nature and extent of a plaintiff's burden to establish standing is a function of the stage to which the litigation has proceeded. Thus:

Since [the elements of standing] are not mere pleading requirements[,] but rather an indispensable part of the plaintiff's case, each element must be supported the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from a defendant's conduct may suffice, for on a motion to dismiss we presume that general

## B. Taxpayer Standing

In *ASARCO Inc. v. Kadish*, 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989), the Supreme Court summarized the law of taxpayer standing:

> The question whether taxpayers or citizens have a sufficient personal stake to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens covers old and familiar ground. As an ordinary matter, suits premised on federal taxpayer status are not cognizable in the federal courts because a taxpayer's interest in the moneys of the Treasury ... is shared with millions of others, is comparatively minute and indeterminable; and the effect upon future taxation, of any payments out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for judicial intervention.
>
> We have indicated that the same conclusion may not hold for municipal taxpayers, if it has been shown that the peculiar relation of the corporate taxpayer to the municipal corporation makes the taxpayer's interest in the application of municipal revenues direct and immediate. Yet we have likened state taxpayers to municipal taxpayers, and thus we have refused to confer standing upon a state taxpayer absent a showing of direct injury, pecuniary or otherwise. *Doremus v. Board of Education of Hawthorne*, 342 U.S. 429, 434 [72 S.Ct. 394, 397, 96 L.Ed. 475] ... (1952).

*ASARCO*, 490 U.S. at 613–14, 109 S.Ct. at 2043 (opinion of Kennedy, J.)[20] (citations, internal quotations, and alterations omitted).

■ From this typically broad language, the courts have .distilled two requirements which one claiming municipal[21] taxpayer standing must allege and prove:

(1) that the complaining party is a municipal taxpayer, and

(2) that municipal funds are being spent on the challenged activities.

---

allegations embrace those specific facts that are necessary to support the claim. *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136–37 (citations, internal quotations, and alterations omitted). When confronted with a complaint which is deficient of allegations which would support the plaintiffs' standing, the court may order pleading with greater specificity, or may order such plaintiffs to present evidence which would establish their standing:

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is well within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

*Warth v. Seldin*, 422 U.S. 490, 501–02, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975). As detailed *supra*, plaintiffs have relied on the allegations in their complaint, their affidavits filed in opposition to defendant's Motion, and their testimony offered in support of their standing at the June 14, 1995 hearing.

**20.** As to the standing issue, *ASARCO* was affirmed by an evenly-divided court (Justice O'Connor took no part in the decision). Despite the confusing alignment of the Justices, and in particular the various attitudes with respect to the portion of Justice Kennedy's opinion from which the quoted passage is taken, none of the concurring and/or dissenting opinions takes issue with the restatement of the law of taxpayer standing offered by Justice Kennedy.

**21.** Whether plaintiffs' standing in this case is properly characterized as that of state taxpayers or municipal taxpayers is unclear. There is no evidence that the county court system is funded by the taxes of any city or town of which any individual plaintiff is a citizen. Further, there is no evidence that there is any tax imposed by county officials which supports the county court system. Given this lack of evidence, it would appear that plaintiffs' standing to challenge the conduct of a state or county official (e.g., the defendant in this case) would be predicated on their status as state taxpayers. Justice Kennedy's characterization of a plaintiff's standing to challenge the reading of the Old Testament in borough (county) schools in *Doremus v. Board of Educ.*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952) as that of a state taxpayer, *see ASARCO, supra*, would confirm that position. Nevertheless, the court will assume, *arguendo*, that plaintiffs' standing is due to be analyzed under the less-stringent municipal taxpayer standard. *See Harvey v. Cobb County*, 811 F.Supp. 669 (N.D.Ga.1993), *aff'd*, 15 F.3d 1097 (11th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 2138, 128 L.Ed.2d 867 (1994) (applying municipal taxpayer standards to an Establishment Clause challenge to a county's display of the Ten Commandments).

*Freedom From Religion Foundation, Inc. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir.1988) ("A plaintiff's status as a municipal taxpayer is irrelevant for standing purposes if no tax money is spent on the allegedly unconstitutional activity"); *Foremaster v. City of St. George*, 882 F.2d 1485, 1489 n. 5 (10th Cir. 1989), *cert. denied*, 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990) ("We need not discuss taxpayer standing because Foremaster did not allege misuse of municipal funds"); *United States v. City of New York*, 972 F.2d 464, 470 (2d Cir.1992) ("[W]e presume a municipal taxpayer's relationship to the municipality is "direct and immediate" such that the taxpayer suffers concrete injury whenever the challenged activity involves a measurable appropriation or loss of revenue"); *Gonzales v. North Township of Lake County*, 4 F.3d 1412, 1416 (7th Cir.1993) ("Municipal taxpayers have standing to challenge tax dollar expenditures that allegedly contribute to Establishment Clause violations"). "The taxpayer's action can meet this test ... only when it is a good-faith pocketbook action." *Doremus*, 342 U.S. at 434, 72 S.Ct. at 397.

■ As part of the second requirement, a plaintiff seeking to establish municipal taxpayer standing must establish a causal link between the use of tax money and the challenged activity. That is, a plaintiff must allege and prove that a "measurable appro-

priation or disbursement of [tax monies is] occasioned solely by the activities complained of." *Doremus*, 342 U.S. at 434, 72 S.Ct. at 397. Thus, expenditures which the taxing authority would incur even absent the allegedly unconstitutional activity cannot satisfy the second element required under municipal taxpayer standing. *Gonzales*, 4 F.3d at 1416 (noting that costs incurred with or without a city's allegedly unconstitutional display of a crucifix cannot satisfy the expenditure requirement under municipal taxpayer standing).

## II. Application of the law of standing to the court's findings of fact.

### A. *Citizen Standing*

Plaintiffs'[22] citizen standing is predicated on the following:

(1) Hersheiser's past exposure to defendant's activities, specifically:

 (a) Hersheiser's voluntary and deliberate exposure, in April, 1995, to defendant's directing that prayer be uttered at the jury organizing session in the Etowah County Courthouse, and

 (b) Hersheiser's being subpoenaed to testify before defendant about 18 months ago, at which time she allegedly observed, for a few minutes, the

---

**22.** In order to establish its standing, plaintiff Alabama Freethought Association has relied exclusively on the standing of its members:

> 4. Plaintiff Alabama Freethought Association is a non-profit association which has as one of its primary concerns the separation of church and state as guaranteed by the United States Constitution and the Constitution of the State of Alabama. *A number of its members reside in Etowah County, Alabama, and are subject to attending Judge Moore's courtroom in Gadsden, either as jurors, litigants, witnesses or observers, and being forced to listen to the opening prayer in Defendant's courtroom and observe his religious symbol(s). These members are, or would be, offended by Defendant's unconstitutional prayer and display and must, therefore, assume special burdens to avoid Defendant's unconstitutional conduct.*

Complaint at 2 (emphasis added); *accord* Affidavit of Pat Cleveland at 1. "[A]n association has standing to bring suit on behalf of its members when: *(a) its members would otherwise have standing to sue in their own right;* (b) the inter-

ests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977) (emphasis added); *accord Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211–12, 45 L.Ed.2d 343 (1975) (To have "representational standing," "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."). Because the asserted "representational standing" of Alabama Freethought Association requires plaintiffs to make the same showing as they must make to establish the standing of individual plaintiffs, the court's discussion of standing with reference to the individual plaintiffs is equally applicable to the standing of the Association. Hereafter, the court's references to "plaintiffs" are intended to denote the individual plaintiffs.

plaque hanging behind defendant's bench, on which was inscribed the Ten Commandments; [23]

(2) individual plaintiffs' and association members' being subject to being called for jury service; and

(3) individual plaintiffs' and association members' being offended at defendant's activities.[24]

In light of controlling authority, each of these facts is insufficient to support plaintiff Hersheiser's standing.

1. *Plaintiff Hersheiser's past exposure to defendant's allegedly unconstitutional display and practice is insufficient to establish a "real and immediate threat" that her future exposure to the same is "certainly impending."*

In *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), plaintiff alleged that, after stopping him for a traffic violation, Los Angeles police officers subjected him to a "chokehold," which rendered him unconscious and damaged his larynx. *Lyons,* 461 U.S. at 97–98, 103 S.Ct. at 1662–63. Plaintiff sued the city under 42 U.S.C. § 1983, seeking damages, an injunction barring future use of the chokehold, and a declaratory judgment that, absent a threat of immediate use of deadly force, use of the chokehold was unconstitutional. *Id.* at 98, 103 S.Ct. at 1663. The district court granted a preliminary injunction barring the use of the chokehold. *Id.* at 99, 103 S.Ct. at 1663.

The Ninth Circuit affirmed, holding that the district court did not abuse its discretion in granting the preliminary relief. *Id.* at 100, 103 S.Ct. at 1664.

The Supreme Court reversed. *Id.* at 113, 103 S.Ct. at 1671. Relying on *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Court held that Lyons lacked standing to seek injunctive relief concerning the City's use of the chokehold. *Id.* at 105, 103 S.Ct. at 1667. The Court's reasoning is instructive:

In *O'Shea v. Littleton,* 414 U.S. 488 [94 S.Ct. 669, 38 L.Ed.2d 674] (1974), we dealt with a case brought by a class of plaintiffs claiming that they had been subjected to discriminatory enforcement of the criminal law. Among other things, a county magistrate and judge were accused of discriminatory conduct in several respects, such as sentencing members of plaintiff's class more harshly than other defendants. The Court of Appeals reversed the dismissal of the suit by the District Court, ruling that if the allegations were proved, an appropriate injunction could be entered.

We reversed for failure of the complaint to allege a case or controversy. *Id.,* at 493 [94 S.Ct. at 675]. Although it was claimed in that case that particular members of the plaintiff class had actually suffered from the allegedly unconstitutional practices, we observed that "[p]ast exposure to illegal conduct does not in itself show a present

---

**23.** Although Hersheiser has also argued that her past jury service, occurring at least 15 years ago, supports her allegations of standing, she also concedes that such prior service would be wholly insufficient to establish the "real and immediate threat of future harm" required to obtain standing. *See* Plaintiff's Supplemental Brief at 13.

**24.** Hersheiser initially claimed standing by virtue of her status as a potential litigant in defendant's court. More particularly, at an earlier point in this litigation, Hersheiser claimed standing by virtue of her status as a named defendant in an action pending in the District Court of Etowah County. In the event of an appeal of that action, an appeal would lie to the Circuit Court of Etowah County. Although that District Court action has been dismissed, the court notes that, even absent the dismissal, the mere possibility that Hersheiser would have been required to appear as a litigant in defendant's court is insufficient to confer standing on her. To place plaintiff Her-

sheiser in defendant's court under this scenario would require the court to assume the confluence of at least two events:

1. that *either* plaintiff Hersheiser or her opponent in the district court action (or, perhaps, both) would, after trial, appeal the decision of the District Court to the Circuit Court of Etowah County; and

2. that, when appealed, the case would be assigned to defendant, as opposed to any of the other three Circuit Judges in Etowah County.

In such circumstances, the threat that Hersheiser would be required to appear before defendant as a litigant is not sufficiently "real and immediate" as to confer on her standing to obtain injunctive or declaratory relief. In any event, that case has been dismissed and that issue is moot as to any claim for declaratory and injunctive relief.

case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.,* at 495–96 [94 S.Ct. at 676]. Past wrongs were evidence bearing on "whether there is a real and immediate threat of repeated injury." *Id.,* at 496 [94 S.Ct. at 676]. But the prospect of future injury rested "on the likelihood that [plaintiffs] will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners." *Ibid.* The most that could be said for plaintiffs' standing was "that *if* [plaintiffs] proceed to violate an unchallenged law and *if* they are charged, held to answer, and tried in any proceedings before petitioners, they will be subjected to the discriminatory practices that petitioners are alleged to have followed." *Id.,* at 497 [94 S.Ct. at 676]. We could not find a case or controversy in those circumstances....

. . . .

No extension of *O'Shea* and *Rizzo* is necessary to hold that respondent Lyons has failed to demonstrate a case or controversy with the City that would justify the equitable relief sought. *Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of chokeholds by police officers.* Count V of the complaint alleged the traffic stop and choking incident five months before. That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconscious-

ness without any provocation or resistance on his part. The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties.

*Lyons,* 461 U.S. at 102–05, 103 S.Ct. at 1665–67 (footnote omitted) (underlined emphasis added) (alterations in original). The Court rejected Lyons' argument that his fear of a future choking incident established a "real and immediate threat of future injury:"

> Lyons alleged that he feared he would be choked in any future encounter with the police. The reasonableness of Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct. *It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.* The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.

*Id.* at 107 n. 8, 103 S.Ct. at 1668 n. 8 (emphasis added). Thus, the Court determined that, because he could not establish a real and immediate threat that he would in the future be subjected to the chokehold, Lyons lacked standing to seek injunctive relief against future application of the chokehold.[25]

▮▮ Under *Lyons* and *O'Shea,* neither of plaintiffs' asserted bases for conferring standing based on her past exposure to defendant's conduct are sufficient. Notwithstanding a possible issue of whether voluntary exposure to allegedly offensive conduct can create "injury-in-fact,"[26] plaintiff Her-

---

**25.** The Court noted:

> Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.

*Lyons,* 461 U.S. at 111, 103 S.Ct. at 1670.

**26.** This court cannot understand how voluntary exposure to purportedly offensive conduct can establish standing to obtain an injunction barring such conduct. To recognize standing in such circumstances would be to allow a plaintiff to "manufacture" her standing. Such a clever machination (or is it masochism), if recognized as legitimate, would make a mockery of the long-standing judicial interpretation of Article III's "case or controversy" requirement. *See Lujan,*

sheiser's prior attendance at the jury organizing session at which defendant authorized prayer to be uttered is insufficient to establish her standing to obtain either a declaratory judgment or an injunction against such conduct. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Lyons,* 461 U.S. at 102, 103 S.Ct. at 1665, *quoting O'Shea,* 414 U.S. at 495–96, 94 S.Ct. at 676; *see also Lujan,* 504 U.S. at 564, 112 S.Ct. at 2138 (same). Hersheiser's prior attendance at the jury organizing session, particularly when viewed in light of its voluntariness, has no probative value whatsoever as to whether Hersheiser will, at some future date, be *required* to attend a jury organizing session, or any other session over which defendant is presiding. To establish standing to obtain declaratory and injunctive relief, plaintiff Hersheiser must allege and provide evidence that the threat of her being exposed to defendant's allegedly unconstitutional conduct is "real and immediate," and "certainly impending." Her voluntary exposure to defendant's conduct in April, 1995 does nothing to fulfill that requirement.

■ For the same reason, Hersheiser's being subpoenaed to testify in defendant's court about 18 months ago does not confer on her standing to obtain declaratory or injunctive relief. The fact that Hersheiser was subpoenaed as a potential witness 18 months ago has no relevance whatsoever as to the likelihood of her being called as a witness before defendant in the future being "real and immediate." There is no evidence to suggest that plaintiff Hersheiser's chances of being subpoenaed to testify before defendant are greater than any other resident of Etowah County or, for that matter, any person subject to the jurisdiction of the Circuit Court of Etowah County. In short, Hersheiser's status as a former witness is insufficient to establish the "real and immediate threat" of future harm required by control-

ling authority for conferring standing to obtain declaratory and injunctive relief.

*2. Plaintiffs have not established that the potential for their being summoned to appear in defendant's court is "certainly impending."*

■ Likewise, plaintiffs' allegations that they have been, and remain subject to being, called as jurors, litigants, and witnesses in defendant's court do not present the real and immediate threat of future harm required by Article III. This is apparent upon an examination of the following:

a. the events which must occur for plaintiffs to be involuntarily placed in either defendant's court or a jury organizing session over which defendant is presiding;

b. Eleventh Circuit authority which squarely holds that one's status as a potential juror is insufficient to establish standing to obtain a declaratory judgment regarding a judge's conduct; and

c. Eleventh Circuit authority which requires a plaintiff seeking injunctive and declaratory relief to establish that his regular course of business requires him to come into contact with the allegedly unconstitutional display or behavior.

The court will examine each of these *seriatim.*

*a. Events which must occur for plaintiffs to be involuntarily placed in either defendant's court or a jury organizing session over which defendant is presiding render plaintiffs' alleged injuries totally speculative.*

As to plaintiffs' status as potential jurors, the speculative nature of plaintiffs' allegations of "injury-in-fact" is apparent from the multiplicity of assumptions necessary to place plaintiffs in defendant's court, where they will be exposed to defendant's allegedly offensive display:

504 U.S. at 565 n. 2, 112 S.Ct. at 2139 ("[I]mminence ... has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, *and the*

*acts necessary to make the injury happen are at least partly within the plaintiff's own control"*) (emphasis added).

1. that the individual plaintiffs, and/or members of plaintiff Alabama Freethought Association, will in fact be summoned for jury service;

2. that, during the time in which plaintiffs are summoned for service, defendant will be engaged in the trial of jury-trial cases, and will therefore have jury needs; and

3. that plaintiffs will be assigned to defendant's court, as opposed to the courts of any of the other three Circuit Judges in Etowah County.

Similarly, the contingent events which must take place in order to place plaintiffs in a jury organizing session, at which defendant will cause prayer to be uttered, include the following:

1. that plaintiffs will in fact be summoned for jury service; and

2. that, at the time which plaintiffs are required to report to the jury assembly room, defendant, as opposed to any of the other three circuit judges in Etowah County, Alabama, will be presiding over the jury organizing session.[27]

These necessary assumptions, any one of which may or may not come to fruition, require the court to conclude that plaintiffs lack standing to maintain this action as potential jurors in defendant's court. In short, "[s]uch 'some day' [possibilities]—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan,* 504 U.S. at 564, 112 S.Ct. at 2138 (alterations added) (emphasis in original).[28]

The speculative nature of plaintiff's alleged future injury as potential jurors bears remarkable similarity to the allegations of some of the plaintiffs in *Roe v. Wade,* 410 U.S. 113, 127–28, 93 S.Ct. 705, 713–14, 35 L.Ed.2d 147 (1973). In *Roe,* the Court was faced with, *inter alia,* allegations from a childless married couple that the Texas statute outlawing abortion was unconstitutional. In concluding that the couple lacked standing, the Court stated:

We thus have as plaintiffs a married couple who have, as their asserted immediate and present injury, only an alleged "detrimental effect upon [their] marital happiness" because they are forced to "the choice of refraining from normal sexual relations or of endangering Mary Doe's health through a possible pregnancy." Their claim is that sometime in the future Mrs. Doe *might* become pregnant because of possible failure of contraceptive measures, and at that time in the future she might want an abortion that might be illegal under the Texas statutes.

*This very phrasing of the Doe's position reveals its speculative character.* Their alleged injury rests on possible future contraceptive failure, possible future pregnancy, possible future unpreparedness for parenthood, and possible future impairment of health. Any one or more of these several possibilities may not take place and may not all combine. In the Doe's estimation, these possibilities might have some real or imagined effect upon their marital happiness. But we are not prepared to say that the bare allegation of so indirect an injury is sufficient to present an actual case or controversy.

*Roe,* 410 U.S. at 128, 93 S.Ct. at 714 (emphasis added). Likewise, to conclude that plaintiffs have presented evidence of injury-in-fact would require the court to engage in a logical leap over at least three suppositions, any one or more of which may never be valid, and any one of which may never occur simultaneously with any other. For plaintiffs to have standing (at least as potential jurors), all three assumptions must be true. At this point, none are true.[29]

---

**27.** There has been no evidence that defendant causes prayer to be said during *each and every* jury organizing session over which he is presiding. The court, however, for the purposes of this decision, makes and considers such an assumption.

**28.** Indeed, the hypothetical nature of the questions posed by plaintiffs' counsel to their clients at the June 14, 1995 evidentiary hearing confirms the speculative nature of their claims concerning their injury-in-fact.

**29.** Despite the fact that plaintiffs are potential litigants, witnesses, and jurors in defendant's

*b. Eleventh Circuit authority squarely holds that one's status as a potential juror is insufficient to establish standing to obtain declaratory relief regarding a judge's conduct.*

■■■ The Eleventh Circuit has squarely considered and rejected the notion that a person's status as a potential juror, without more, is sufficient to establish his standing to challenge a judge's activities. In *Emory v. Peeler,* 756 F.2d 1547, 1549–50 (11th Cir. 1985), a former juror sued a state court judge in whose court plaintiff served, alleging that the judge's comments to the media concerning possible perjury charges against plaintiff for certain answers to voir dire questions were defamatory and violated his constitutional rights. Plaintiff sought money damages and a declaratory judgment. *Id.* at 1551. The district court dismissed all claims for declaratory judgment, holding that plaintiff lacked standing. In affirming the district court, the court reasoned:

> Emory asks that the district court declare that the statements Judge Peeler made about him were in violation of Emory's constitutional rights and of the laws of Georgia. 28 U.S.C. § 2201 (1982), echoing the "case or controversy" requirement of article III of the Constitution, provides that a declaratory judgment may only be issued in the case of an "actual controversy." That is, under the facts alleged, there must be a substantial continuing controversy between the parties having adverse legal interests. The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred. Additionally, the controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative, threat of future injury. The remote possibility that a future injury may happen is not suffi-

cient to satisfy the "actual controversy" requirement for declaratory judgments. *See City of Los Angeles v. Lyons,* 461 U.S. at 103, 103 S.Ct. at 1666 (1983).

> Emory alleges that he has been injured by Judge Peeler's past conduct, both inside and outside of the courtroom. Emory makes no factual allegation, however, that such conduct has continued or will be repeated in the future. *The mere possibility that Emory will once again be summoned, qualified, and selected to sit as a juror in a capital case before Judge Peeler and perhaps subjected to a reenactment of the scenario that occurred in this case is too remote to be labeled a controversy.* A declaration that Judge Peeler's past conduct violated Emory's constitutional rights and Georgia law would be nothing more than a gratuitous comment without any force or effect.

> In sum, Emory's claim for declaratory judgment relief fails to satisfy the threshold "case or controversy" requirement of article III and the "actual controversy" requirement of 28 U.S.C. § 2201. Accordingly, the district court was correct in dismissing that claim.

*Emory,* 756 F.2d at 1551–52 (citations, footnotes, and internal quotation omitted) (emphasis added).

Paraphrasing *Emory,* "[t]he mere possibility that [plaintiffs] will ... be summoned, qualified, and selected to sit as ... juror[s] ... before Judge [Moore] ... is too remote to be labeled a controversy." *Emory,* 756 F.2d at 1552. The chance that plaintiffs will, when called for jury service some day, be exposed to defendant's activities or display, does not constitute a real and immediate threat of injury which is certainly impending. In short, plaintiffs do not have standing as potential jurors.[30]

court, the fact that no individual plaintiff is such *at the present time* presents a significant issue of ripeness. In other words, leaving aside any issue concerning plaintiffs' standing, there may not yet be a live "case or controversy" for purposes of Article III. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (ripeness does not exist until the effects of a challenged action are "felt in a

concrete way by the challenging parties"); *see also Warth,* 422 U.S. at 516, 95 S.Ct. at 2214.

**30.** Although *Emory* was not an Establishment Clause case, the court again notes the Supreme Court's admonition in *Valley Forge* that the philosophy that the case or controversy requirement is a mere nuisance "does not become more palatable when the underlying merits concern the Establishment Clause." *Valley Forge,* 454 U.S.

Although *Emory* should resolve any issue as to whether plaintiffs' status as potential jurors is sufficient to confer standing, the court notes that the Fifth Circuit's en banc holding in *Society of Separationists, Inc. v. Herman,* 959 F.2d 1283 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 135 (1992), is consistent with *Emory.* In *Herman,* a Texas state judge held plaintiff, a prospective juror, in contempt of court for refusing, on religious grounds, to swear or affirm that she would answer truthfully in answering voir dire questions. Plaintiff sued, seeking damages, as well as declaratory and injunctive relief, for alleged violations of the Free Exercise Clause. The court held that, despite her past exposure to allegedly unconstitutional conduct, plaintiff lacked standing to obtain declaratory and injunctive relief. Relying on *Lyons,* the court reasoned that plaintiff could not "show a real and immediate threat that she will again appear before Judge Herman as a prospective juror and that Judge Herman will again exclude her from jury service and jail her for contempt." *Herman,* 959 F.2d at 1285. Specifically, the court stated:

> There are over half a million residents in Travis county [the county in which the judge served] and twenty trial judges.

The chance that O'Hair will again be selected for jury service and that Judge Herman will be assigned again to oversee her selection as a juror is slim.

*Id.*

Like the plaintiff in *Herman,* the individual plaintiffs in this case allege that, because they are subject to being called as jurors, they may in the future come into contact with defendant and his allegedly unconstitutional conduct and display. As the *Herman* court found, plaintiff Hersheiser's prior exposure, especially considering its voluntary nature, to defendant's causing prayer to be said, and her being subpoenaed in the past, creates no inference whatsoever that she will be imminently subjected to defendant's conduct and display. None of the plaintiffs' prior jury service leads to any inference that the likelihood of their being summoned for jury duty before defendant is "real and immediate" or "certainly impending." Indeed, the chance that any of these plaintiffs will be summoned for jury service is the same as the chance that any other person eligible for jury service in Etowah County will be so summoned. Thus, *Herman* confirms this court's holding that, under *Emory v. Peeler,* 756 F.2d 1547 (11th Cir.1985), plaintiffs' status as potential jurors is insufficient to confer standing.[31]

at 489, 102 S.Ct. at 767. The doctrine of standing should not be manipulated because the decision maker may have a predilection with regard to purported merits.

31. Even assuming that plaintiffs' mere status as potential jurors could create a real and immediate threat of harm for purposes of Article III standing, the prudential considerations which accompany a court's determination of a litigant's standing to sue would counsel against conferring standing on these plaintiffs. The primary prudential consideration in making a determination of standing has been made clear by the Supreme Court: "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *see also Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 759–60 (1982); *Lujan,* 504 U.S. at 573–74, 112 S.Ct. at 2143; *United States v. Hays,* —— U.S. ——, —— ——, 115 S.Ct. 2431, 2434–36, 132 L.Ed.2d 635 (1995) (noting this principle).

Applying that standard, the court concludes that, to the extent plaintiffs seek to establish their standing by virtue of their status as potential

jurors, they assert a generalized grievance. Plaintiffs' status as potential jurors is shared by every other potential juror in Etowah County. Under Alabama law, every registered voter, every person holding a driver's license and registering motor vehicles, utility customers, and persons in whose name property which is subject to ad valorem taxation is listed, can be eligible for jury service. *See Ala.Code* § 12–16–57 (defining the "Master List" of potential venirepersons). With the parties' approval, the court requested that the Circuit Clerk of Etowah County provide statistical data concerning the number of persons subject to being called as jurors in the Circuit Court of Etowah County. The court has filed the information received from the Circuit Clerk. According to that data, the jury list is composed of the names of all persons residing in Etowah County, Alabama who are over the age of 19, and who hold either a driver's license or other photographic identification. According to the latest data provided by the Clerk, it appears that there are 75,750 persons who are eligible for jury service in Etowah County. Thus, to the extent plaintiffs assert standing as potential jurors, their grievance is shared by so large a number of others (at least 75,750 others) that the court, following *Warth* and its progeny, is unable to

*c. Eleventh Circuit authority requires a plaintiff seeking injunctive and declaratory relief to establish that his regular course of business or other activities subjects him to contact with the allegedly unconstitutional display or behavior.*

■■■ Eleventh Circuit authority has repeatedly held that, in order to have standing to obtain injunctive or declaratory relief in Establishment Clause cases, a plaintiff must allege and prove that the pursuit of his regular affairs causes exposure to the challenged activity. In *American Civil Liberties Union v. Rabun County Chamber of Commerce*, 698 F.2d 1098, 1108 (11th Cir.1983), the court held that both a regular camper in Georgia state parks and the operator of a summer camp whose land looked onto the park in question had standing to challenge the maintaining of a large cross on state park land. Likewise, in *Saladin v. City of Milledgeville*, 812 F.2d 687 (11th Cir.1987), the court held that plaintiffs, each of whom regularly received business correspondence from the city, on which was affixed the municipal seal, had standing to challenge the use of the word "Christianity" in the inscription on the seal. In *Harvey v. Cobb County*, 811 F.Supp. 669 (N.D.Ga.1993), *aff'd*, 15 F.3d 1097 (11th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2138, 128 L.Ed.2d 867 (1994), the court held that an attorney whose practice required him to make regular appearances in the Cobb County Courthouse had standing to challenge the county's placement of the Ten Commandments on a wall adjacent to the Clerk's Office.

■■■ In all of these cases, plaintiffs had standing because their regular course of business (or pleasure, as was in part the case in *Rabun County*) repeatedly subjected them to the allegedly unconstitutional conduct.[32] The court in *Harvey* concluded that

conclude that the harm to these plaintiffs, as compared to the harm occasioned upon every other potential juror in Etowah County, is so distinct as to confer standing. While the court does not vouch for the exact number of eligible jurors, it is obviously a large number.

32. The Seventh Circuit required the same showing in *Doe v. County of Montgomery*, 41 F.3d 1156 (7th Cir.1994). In *Doe*, plaintiffs Doe, Roe, and Stein alleged that they had standing to challenge the constitutionality of the county's display of a sign, reading "The World Needs God," which was permanently affixed over the main entrance to the county courthouse. Doe and Roe alleged that they "must use the courthouse ... to fully participate as citizens of the County and to fulfill certain legal obligations." *Doe*, 41 F.3d at 1158. Specifically, "Doe and Roe must enter the courthouse to visit the offices of the State's Attorney, County Clerk, County Treasurer and Sheriff, and to attend meeting of the County Board." *Id.* Additionally, Doe and Roe alleged that they "are subject to being called for jury duty...." *Id.* Plaintiff Stein, an attorney, alleged that, because he objects to the sign, "he will not represent clients whose cases would be heard in the courthouse." *Id.* However, Stein acknowledged that he had never been to the courthouse, and had never seen the sign.

The Seventh Circuit held that Doe and Roe had standing to challenge the display, *but that Stein did not have standing*. In finding that Doe and Roe had standing, the court chiefly relied on their allegation "that they must come into direct and unwelcome contact with the sign in order to fully participate as citizens of the County and to fulfill certain legal obligations." *Id.* at 1159. The court reasoned:

> *Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463 (7th Cir.1988) is not to the contrary. In *Zielke*, we affirmed the district court's dismissal of a challenge to the display of a monument of the Ten Commandments in a city park for lack of standing. The plaintiffs did not alter their behavior as a result of the monument and failed to demonstrate that they were exposed to the monument during their normal routines or in the course of their usual driving or walking routes. *Zielke*, 845 F.2d at 1468–69. In contrast, Doe and Roe allege that they must come into direct and unwelcome contact with the sign in order to participate in their local government and fulfill their legal obligations.

*Id.* at 1161. As to plaintiff Stein, the court reasoned that his allegations of injury approached "pure speculation and fantasy," and thus were insufficient to support his standing. *Id.* at 1162.

Unlike plaintiffs Doe and Roe in *Doe*, plaintiffs in this case have made no allegation, and have not offered a scintilla of evidence, to suggest that they "must come into direct and unwelcome contact with the sign in order to participate in their local government and fulfill their legal obligations." *Doe*, 41 F.3d at 1161. To the contrary, the allegations and evidence presented in this case are closely akin to the situation in *Zielke*, which the *Doe* court distinguished. Like the plaintiffs in *Zielke*, plaintiffs in this case have neither alleged nor offered evidence to suggest that, in order to avoid coming into unwelcome contact with defendant's allegedly unconstitutional conduct, they must change their normal

to require the attorney to conduct his business in such a manner as to avoid the allegedly unconstitutional display would impose an undue burden on him. In this case, plaintiffs have neither alleged nor provided evidence to suggest that their business affairs or other activities include their making regular appearances in defendant's courtroom. Moreover, plaintiffs have neither alleged nor offered evidence that, in order to avoid defendant's allegedly offensive conduct, they will be subjected to undue burdens. In short, none of the cases cited above compels a conclusion that plaintiffs have standing.[33]

3. *Plaintiffs' being offended by defendant's display and conduct is insufficient to establish their standing.*

Plaintiffs' allegation that they are offended by defendant's display and conduct is no more than a subjective complaint of harm, and is not sufficient to establish the objective "injury-in-fact" necessary to establish standing. As the Supreme Court has made clear, "[a]llegations of a subjective

'chill' are not an adequate substitute for a claim of a specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972). Indeed, it should be remembered that this is an action *against a specific defendant* by persons and an organization who claim to be in imminent danger of being injured *by him.*

Moreover, plaintiffs' status as active participants in public debate, and as vociferous opponents of defendant's activities, is simply too thin a mantle in which to cloak their standing to litigate this dispute in a federal forum. "[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Valley Forge*, 454 U.S. at 486, 102 S.Ct. at 766; *accord Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) ("[a] mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient ...").

course of business or other activities. Indeed, this record is utterly bereft of either allegation or evidence to indicate that any individual plaintiff's normal activities require that person to go to the Etowah County Courthouse, or particularly to courtroom(s) therein, the situs of all instances of allegedly unconstitutional conduct. In sum, the absence of allegation and evidence to suggest that plaintiffs' normal course of business requires them to go to the Etowah County Courthouse, and in particular to defendant's courtroom or to jury organizing sessions over which defendant is presiding, requires the court to conclude, even applying *Doe*, upon which plaintiffs rely, that plaintiffs in this case lack standing.

Plaintiffs have argued that, under *Doe*, their status as potential jurors is enough to establish their standing. The *Doe* court's noting that Doe and Roe were potential jurors was completely gratuitous and in dicta. *Doe* did not hold that Doe and Roe's status as potential jurors, standing alone, was sufficient to establish standing. Even if *Doe* so held, this court is bound to follow *Emory v. Peeler*, 756 F.2d 1547 (11th Cir.1985).

33. In *O'Hair v. White*, 675 F.2d 680, 683 (Former 5th Cir.1982) (en banc), plaintiff, an atheist, alleged that a Texas constitutional provision requiring jurors and political candidates to profess their belief in a supreme being was unconstitutional. *Id.* at 690. Plaintiff alleged that, as a result of the application of the provision, she had been disqualified from jury service in the past.

Plaintiff also alleged that, as a litigant in four pending civil actions in Texas, application of the provision would deny her Seventh Amendment jury trial rights. The court held that the concrete and particularized harm which plaintiff had suffered, and was in imminent danger of suffering, from the application of the provision, was sufficient to establish her standing.

To the extent that *O'Hair* is controlling, the court's conclusion that plaintiffs lack standing is consistent with that case. Unlike the plaintiff in *O'Hair*, who was a litigant in four cases then pending in the Texas courts, plaintiffs in this case have not demonstrated that their involuntary contact with the challenged conduct and display is imminent and unavoidable. As to any suggested conclusion in *O'Hair* that the plaintiff's prior rejection as a juror was sufficient to establish standing, the court notes that *O'Hair* was decided one year before the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), which made clear that past exposure to illegal conduct is insufficient to support standing to obtain injunctive and declaratory relief. Thus, to the extent that the *O'Hair* court determined that plaintiff's past exposure to the oath requirement, without more, was sufficient to establish her standing, *O'Hair* was overruled by *Lyons*. In any event, there was no clear-cut distinction made in *O'Hair* as to the bases for finding standing. The general standing discussion in *O'Hair* is entirely consistent with that here. The court particularly

Plaintiffs' being offended by defendant's allegedly unconstitutional display and conduct is a matter which may be the subject of great public debate. The notoriety of the topic, however, does not diminish Article III's unwavering requirement that the litigants before the court have standing. Thus,

Were the federal courts merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of "standing" would be quite unnecessary. But the "cases and controversies" language of Article III forecloses the conversion of courts of the United States into judicial versions of college debating forums.

*Valley Forge,* 454 U.S. at 473, 102 S.Ct. at 759. While the debate may be legally (and theologically) enticing, the "cases and controversies" language of Article III fashions no exception for the intellectually stimulating or politically divisive subject.

In sum, the federal courts were not constituted as the roving "ombudsmen of the general welfare." *Valley Forge,* 454 U.S. at 487, 102 S.Ct. at 767. As the Supreme Court has stated, "the philosophy that the business of the federal courts is correcting constitutional errors [without regard to whether litigants have standing] has no place in our constitutional scheme. It does not become more palatable when the underlying merits concern the Establishment Clause." *Id.* at 489, 102 S.Ct. at 767. Rather, the federal courts were established to preside over the resolution of "cases and controversies," as those Article III terms have been defined by a federal judiciary whose analyses are informed by reason and experience. Because plaintiffs have not demonstrated a "real and immediate threat" that they will be harmed by defendant's display and conduct, they have not established that the likelihood of their suffering "injury-in-fact" is "certainly impending." For these reasons, plaintiffs have not established citizen standing.[34]

### B. *Municipal Taxpayer Standing* [35]

 Applying the two-prong test for establishing municipal taxpayer standing, the court concludes that plaintiffs have not established such standing. Although the court has found each individual plaintiff to be a taxpayer, plaintiffs have not alleged that a "measurable appropriation" of tax revenue is being spent on either defendant's display of the plaque in his courtroom, or on defendant's activities in causing prayer to be uttered in a jury organizing session. Moreover, plaintiffs have presented no evidence that any tax money whatsoever is spent on the maintaining of the plaque hanging in defendant's courtroom, or on defendant's activities in causing prayer to be said at jury organizations.[36]

calls attention to pages 685–88, as well as footnote 18.

**34.** Again, plaintiff Alabama Freethought Association has not asserted standing on the basis of some purported injury in fact which *it,* as opposed to *its members,* is in imminent danger of suffering. *See supra* note 22. If any such associational right(s) could be so asserted and recognized as a basis for standing, individual plaintiffs, each of whom lacked standing, could form an association, which would in turn have standing. This form of manipulation would be equally as egregious as other forms of manipulation in the area of standing alluded to *supra.* Given that plaintiff Alabama Freethought Association has relied exclusively on the standing of its individual members, *see supra* note 22, the court's determination that no individual plaintiff has standing applies with equal force to the standing of plaintiff Alabama Freethought Association.

**35.** Plaintiffs' allegations in their complaint related to taxpayer standing are limited to the following:

6. ... Plaintiffs Hersheiser, Stappenbeck and Stappenbeck are taxpayers in Etowah County, Alabama, and the State of Alabama. Plaintiff Alabama Freethought Association has, as members, persons who are taxpayers in Etowah County, Alabama, and the State of Alabama.

**36.** The Order which set this cause for an evidentiary hearing stated as follows:

At said time and place, the plaintiffs will, as to those plaintiffs claiming standing, examine said plaintiffs as to their "injury in fact" *and other standing issues.* Said parties shall, of course, be subject to cross-examination. (emphasis added).

The court's order specifically contemplated that plaintiffs would present all of their evidence as to their standing at the June 14, 1995 hearing. At the conclusion of that hearing, plaintiffs' counsel informed the court that they had offered all of the evidence they intended to offer on the standing issue:

THE COURT: Does everybody agree that as to the only presently pending issue to be resolved

Even assuming that some tax money is spent on the activities forming the basis of this action, plaintiffs still have not established, and likely could not establish, the required causal link between the challenged activity and the expenditure necessary to assert even municipal taxpayer standing. First, assuming, as was the case in *Harvey v. Cobb County*, that plaintiffs were to adduce some evidence that the janitorial staff of the Etowah County Courthouse occasionally dusted the plaque, proof of the same could not establish standing absent evidence that the county would not have incurred the costs of compensating their cleaning staff but for their having to dust the plaque. *See Gonzales*, 4 F.3d at 1416.[37] Moreover, even if the court assumed that some measurable portion of defendant's time spent as a judge is devoted to his causing prayer to be uttered, and that such time could amount to an expenditure of some percentage of his salary, plaintiffs have not established, and likely could not establish, the required causal connection between the challenged activity and the expenditure. Because defendant would be paid his salary even in the absence of his engaging in the allegedly unconstitutional activities, plaintiffs would likely be unable to prove that the county (or the state) would not have incurred the same costs of compensating defendant for his duties as a judge but for his engaging in allegedly unconstitutional acts. *Gonzales*, 4 F.3d at 1416. In any event, no such evidence was presented.

██ Further, plaintiffs have not satisfied the overriding requirement for municipal taxpayer standing: that the claim be "a good-faith pocketbook action." *Doremus*, 342 U.S.

at 434, 72 S.Ct. at 397. Plaintiffs have not filed this action to guard against the improper use of identifiable and measurable tax dollars. Indeed, "[i]t is apparent that the grievance which it is sought to litigate here is not a direct dollars-and-cents injury but is a religious difference." *Doremus*, 342 U.S. at 434, 72 S.Ct. at 397.[38]

For these reasons, it is apparent that plaintiffs have not established municipal taxpayer standing.

## IV. Summary

Article III standing strikes at the heart of a federal court's power to address the merits of a dispute. As the United States Supreme Court has stated,

Article III, which is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to overcome if possible so as to reach the "merits" of a lawsuit which a party desires to be adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution in Philadelphia in 1787, a charter which created a general government, provided for the interaction between that government and the government of the several States, and was later amended so as to either enhance or limit its authority with respect to both States and individuals.

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 476, 102 S.Ct. 752, 760–61, 70 L.Ed.2d 700 (1982). To this end, Article III of the United States Constitution limits the jurisdiction of the federal courts to "cases

---

by the Court that all of the evidence that's going to be submitted has been submitted and as to those issues the case is under submission?
MS. SUMNERS: Yes, Your Honor.
Transcript of June 14, 1995 Hearing at 84.

**37.** In *Harvey*, Judge Shoob determined that, because plaintiff had provided evidence that the cleaning staff occasionally dusted the depiction of the Ten Commandments, plaintiff had established that the county spent tax funds on the display. This was a rather thin reed upon which to base taxpayer standing. To the extent that Judge Shoob determined that the occasional dusting satisfied the second prong of municipal

taxpayer standing, despite the lack of any evidence to suggest that the county would not have incurred the same costs of paying their cleaning staff but for their being required to dust the depiction, this court declines to follow *Harvey*. The unpublished affirmance by the Eleventh Circuit is not controlling authority, particularly when citizen standing may have been appropriate in that case.

**38.** Persons who have merely an ideological stake in the outcome of an action do not have standing to bring that action. *See generally* ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 2.3.5 (2d Ed.1994) (noting the prohibition against generalized grievances in the context of taxpayer standing).

and controversies." For a court to be presented with a case or controversy, the litigants before it must have standing to pursue their claims. *Id.* To establish their standing, plaintiffs must allege and present evidence of the following: (1) injury in fact, which is concrete and particularized, and actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the relief sought will redress the injury. *Northeastern Florida Chapter of the Associated Gen. Contractors v. City of Jacksonville,* — U.S. —, — – —, 113 S.Ct. 2297, 2301–02, 124 L.Ed.2d 586 (1993). In cases involving declaratory and injunctive relief, such as this case, a plaintiff must establish a real and immediate threat of future injury. *Cone Corporation v. Florida Dept. of Transp.,* 921 F.2d 1190, 1203–05 (11th Cir.), *cert. denied,* 500 U.S. 942, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991). Past exposure to illegal conduct does not suffice to confer standing to seek declaratory and injunctive relief, absent a real threat of imminent and continued exposure to the conduct. *City of Los Angeles v. Lyons, supra; Emory v. Peeler, supra.*

Applying these principles to the allegations in the complaint, the affidavits filed in opposition to the present motion, and the testimony received at the hearing, the court has concluded that plaintiffs lack standing. Whittled to its core, plaintiffs seek to establish their standing as citizens by virtue of their being *subject to* being called to defendant's court, either as litigants or for jury service. Thus, with regard to the issue of citizen standing, there is only one issue before the court: whether persons who are merely subject to the possibility of a call to jury service at some uncertain future time or as to whom there is a possibility that they will be involved in court actions in that courthouse at some uncertain future time, have standing to enjoin the conduct of a particular judge in that courthouse. The same issue is presented with regard to an organization whose members may be subject to the same possibility of a jury call or court involvement.[39]

In light of the allegations and evidence presented, the court concludes that plaintiffs' status as potential jurors and litigants is insufficient to establish their standing. Plaintiffs have provided neither allegation nor evidence that plaintiffs are in imminent threat of being called before defendant's court. *Emory v. Peeler, supra.* Likewise, there is neither allegation nor evidence that plaintiffs have been called to defendant's court with such regularity that it is reasonable to expect that they will be so called in the immediate future. In sum, none of these allegations present the "real and immediate threat of future harm" required in order to find that plaintiffs have standing to maintain this action.

Similarly, plaintiffs' attempt to establish standing as municipal taxpayers fails. To establish standing as municipal taxpayers, plaintiffs must allege and prove (1) that they are municipal taxpayers, and (2) that municipal tax funds are being expended on the challenged conduct. Plaintiffs have neither alleged nor provided any evidence to suggest that municipal tax funds are being spent on the challenged activities, nor that, in any event, their status as taxpayers would be affected by an injunction. Accordingly, plaintiffs have not presented evidence from which the court can conclude that they have standing as municipal taxpayers.[40]

Because plaintiffs have failed to show that they have been, or are about to be, injured in fact, plaintiffs have not presented a case or controversy for purposes of Article III. Accordingly, the court is without jurisdiction to address the merits of the dispute and, of course, has not done so.[41]

---

**39.** At the hearing, the court asked the parties to brief this specific issue. Plaintiffs cited only *Doe* as being purportedly on point.

**40.** As noted *supra,* there may be some question as to whether a county taxpayer is a "municipal" taxpayer. The court has assumed so.

**41.** Because the court has determined that plaintiffs lack standing, it is unnecessary for the court to consider whether abstention is appropriate.

Eleventh Amendment immunity likely also compels the court to dismiss claims brought against defendant. Under *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984), "a claim that state officials violated state law in carrying

## CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss will be granted. This action will be dismissed, without prejudice, for lack of standing.[42]

## DISMISSAL ORDER

Pursuant to the Findings of Fact and Conclusions of Law filed contemporaneously herewith, this action and all claims therein are **DISMISSED, WITHOUT PREJUDICE.** Costs are assessed against plaintiffs.

out their official responsibilities is a claim against the state that is protected by the Eleventh Amendment." "This principle applies as well to state-law claims brought into federal court under [supplemental] jurisdiction." *Id.; see also Silver v. Baggiano,* 804 F.2d 1211, 1213 (11th Cir.1986) (same). Thus, to the extent that plaintiffs claim that defendant's conduct violates the state constitution, such claims are likely barred by the Eleventh Amendment.

**42.** Dismissal for lack of standing operates procedurally as a dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1), FED.R.CIV.P. *Region 8 Forest Service Timber Purchasers Council v. Alcock,* 993 F.2d 800, 807 n. 8 (11th Cir.1993), *cert. denied sub nom. Southern Timber Purchasers Council v. Meier,* —— U.S. ——, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994). Such a dismissal is not on the merits, and is therefore without prejudice. *See Marine Coatings of Alabama, Inc. v. United States,* 792 F.2d 1565, 1567 (11th Cir.1986).